This is a contest over the guardianship of the person of Dorothy Minada, known as Dorothy Abbott, a minor, born January 5, 1921, at Lodi, California. The petitioner Alda Minada, now Costa, is the mother of the child. Cross-petitioners Jay S. Abbott and Gladys W. Abbott, his wife, now have and have continuously had the care and custody of the child ever since she was a few days old. The Minada-Costa petition was denied on the ground of the abandonment and nonsupport of the child by petitioner, and the petition of cross-petitioners was granted. This appeal is by the petitioner. The determination of this appeal rests on the sufficiency of the evidence to support the findings of abandonment and nonsupport made by the trial court, viz.: Findings 2, 3 and 4, which findings are as follows:
"2. On January 15th, 1921, said petitioner, with the intent thereby to entirely sever the parental relation existing between herself and said child, and with the intent to throw off all obligations growing out of said parental relation, gave said child to cross-petitioners at said Lodi. Cross-petitioners then and there accepted said child from petitioner, took said child into their home, and since the date *Page 497 
aforesaid continuously have supported, cared for, and nurtured said child as their own. Since the date aforesaid cross-petitioners have continuously resided with said child at said Lodi. Petitioner continued to live at said Lodi until on or about 1927 since which time she has resided with her husband at San Mateo, California. During the entire period elapsing from January 15th, 1921, until on or about November, 1921, petitioner never in any manner communicated with or attempted to communicate with said child or with cross-petitioners or either of them. During the entire period last mentioned petitioner knew that the said child was in the custody of cross-petitioners at said Lodi.
"3. Said child was given by petitioner to cross-petitioners as aforesaid without any provision for its support, and petitioner did not at any time during the period last aforesaid support, or contribute to the support, or offer to contribute to the support of said child in any way or to any extent whatsoever, although able to do so.
"The matters and things hereinabove set forth in Findings 2 and 3 supra were had and done by petitioner with the intent on her part to abandon said child."
The trial court also found that the mother was a fit and proper person to have the custody of the child.
On January 5, 1921, a child was born to appellant (while unmarried) at the hospital in Lodi. This baby was normal in respect to health and development. A few days after the birth, appellant told her nurse that she did not want her offspring. She refused to nurse her, although capable of doing so. When the baby was brought to her bed, she pushed it away.
Shortly thereafter an advertisement appeared in a Lodi newspaper, the substance of which was that the child was to be given away. It does not appear by whose authority this advertising was done. The first information respondents had in respect to the child was received from this newspaper. They were husband and wife, and had lived in Lodi for some time. The husband worked in the laundry where appellant was employed. Respondents called at the home of Mrs. Orselli where appellant was temporarily residing. Mrs. Orselli had been in the United States for a number of years, and she spoke both English and Italian. *Page 498 
Her testimony as to what transpired when respondents called, is as follows:
"I went to the door and there was a lady there, and she asked me, says `I came here to take the baby, the girl she was to the hospital, and I heard she told them she want to give away', and I said `I don't know anything about it', and she said `go and ask the lady' and I went in the room and asked her . . . Alda never answered for a few minutes, she think a while, then she said `well, it is all right' she says, `I think it is the best way for me to give her away.' So I took the baby. She said something else then I think — I know she did say she would like to get the baby back some time, but I — you know I took the baby away and I didn't pay no attention, I went and took the baby to the lady, to this lady. . . . So this lady, she say to me, `Do you know me'; I says `I am not quite sure but I think so' . . . So she says `all right'." . . .
"Q. She (appellant) asked you if you knew she was going to take the baby? A. Yes, she asked me. I says `I think she is Jay's wife', — we used to call him Jay — but I says I am not sure, because I was not real sure. Q. You said `I think she is Jay's wife? A. Yes. Q. And she knew the Jay you meant was Mr. Abbott? A. Yes. Q. And you told Mrs. Costa at that time `I think this lady is Jay's wife'? A. Yes, but I was not real sure, I said. . . . Q. Did she say anything about finding out for sure whether or not you knew the lady? A. At that time? Q. Yes. A. No, that night she went to bed and I went to bed and she never told me nothing. That night, she told me before, first, you know, she told me when I came back, she asked me if I knew the lady. I says `I think she is Jay's wife, I am not sure.' Q. Then when the baby was taken out by you to the porch, did you find for sure if it was Mrs. Abbott? A. I was pretty sure, but you know I never want to say exactly I was sure, but I was pretty sure. Q. You knew it was her? A. Well, I was pretty sure she was her. . . . I think it was Mrs. Abbott, because Mrs. Orselli told me. Q. Mrs. Orselli told you Mrs. Abbott was there? A. Right away she said she did not recognize her, then afterwards she told me it was. Q. She knew her? A. Yes. . . . Q. She didn't tell you it was Mrs. Abbott, you said just now? A. No, she didn't say `Mrs. Abbott', I asked *Page 499 
her. Q. You said it was that night, after that, you said so? A. Afterwards told me it was Mrs. Abbott, yes. Q. When did she tell you it was Mrs. Abbott? A. I asked her `Do you know the lady'? She says `Yes, I think I do'. Q. And she said `Mrs. Abbott'? A. Yes. Q. When was it you asked her that? A. Right after. Q. Right after she took the baby? A. Yes."
Respondents took the child into their home and have reared and nurtured it as their own. The relations between the child and them are the same as if the child were their own. During all this time they have resided continuously at Lodi. During all the period in question, viz., from January 15, 1921, until about Thanksgiving time, 1929, a period of approximately nine years (eight years and ten months) neither appellant nor any person on her behalf, ever communicated or attempted to communicate either with the child or with respondents in any way whatever in relation to the child. Two reasons are assigned by appellant by way of excuse for her conduct in having ignored the existence of the child during this nine-year period, viz., her physical condition, and her financial condition.
Appellant continued to reside at Lodi. After an interval of two months following the birth of the child, she went to work in the Cosmopolitan Hotel in Lodi, and worked there continuously for six months, receiving her board, lodging, and $50 per month. She testified that with this money she dressed herself and gave some to her father. She quit work in this hotel about October 1, 1921, and laid off until March 24, 1922, when she married Costa. Following that for four years, and until June, 1926, she and Costa operated the Piazza Hotel in Lodi. During this time respondent Jay Abbott made many calls at the hotel with his laundry wagon. Then for two years, and until March, 1928, they lived in a rented house in Lodi, during which time Costa was in the bakery business there. In March, 1928, they moved to San Mateo where they have since continuously operated a thirty-room hotel and where they have also bought and paid in full for a $4,500 house. Appellant disclosed the facts relating to the child to Costa a month or two after they were married.
The testimony with reference to the illness of appellant during these nine years is far from convincing. She admitted *Page 500 
that during the last four years she was well. She contributed absolutely nothing toward the support of her child, though financially able to do so at least part of the time. She never attempted to see or communicate with her child, who for years lived but a few blocks away in a small community.
Subdivision 4 of section 246 of the Civil Code provides that "any parent who knowingly or willfully abandons, or having the ability so to do, fails to maintain his minor child under the age of fourteen years, forfeits the guardianship of such child".
[1] We are of the opinion that the evidence in this case affords ample justification for a finding by the trial court that appellant, by her conduct, forfeited the guardianship of the child. If the facts of this case do not warrant a judgment of abandonment and forfeiture, then the section of the code cited may as well be torn from our statutes and scattered to the winds. We have carefully considered those cases relied upon by appellant, but none of them presents such an array of facts as we have here, bearing upon the lack of love and solicitude on the part of the mother. From a mother with wholesome and natural maternal instincts, evinced by her conduct toward her offspring, the courts are extremely reluctant to sever the ties of blood. This is the foundation of the mother's right to her child, and is an impelling fact in a case of this character. In the case of Inre Green, a minor, cited by appellant and found in 192 Cal. 714
[221 P. 903, 905], the court states that "it also appears from respondent's testimony that from time to time appellant visited the ranch where the child was and that she has visited her more frequently the last three years than before". In the instant case, though the parties lived but a few blocks apart, not one visit was paid to the child by the mother over a period of some eight years. The evidence of intention to abandon when the child was originally taken is very weak in the Green case. The child in that case was taken to a ranch in Sonoma County by its mother, where both lived with a half-sister of the mother. The latter and her child moved to Berkeley. On several occasions the child was taken back on visits to the ranch. Finally respondent and her husband objected to the child being moved back and forth so often, and insisted that either appellant *Page 501 
or they must keep her. The mother then stated that it was probably the best thing to do to leave the child with respondents. The mother had to support herself, and she had no means of her own. She admitted that her child was better off on the ranch. This is the entire showing upon the question of intent when the custody of the minor was delivered. In the instant case, as we have pointed out, the advertisement was placed in the local newspaper, and when respondents called for the child the mother said, "I think it is best for me to give her away."
It clearly appears from the evidence that when this child was a mere infant a definite understanding and agreement was entered into between appellant and respondents, whereby appellant finally relinquished to respondents all of her parental rights over the child, and respondents in turn undertook and agreed to keep and maintain the child and raise it as their own. Respondents have kept and faithfully performed their part of the agreement. Now the child, having arrived at an age where it might be regarded by appellant as an asset instead of an encumbrance, appellant for the first time has her maternal instincts aroused and seeks to repudiate her agreement and take back her child. The intention upon her part to voluntarily relinquish the child appeared at the very beginning, and was adhered to for some nine years thereafter.
[2] It is contended by appellant that the court found on certain issues which were not presented by the pleadings. An examination of the record discloses that the case was presented and tried upon the theory that such matters were at issue. Furthermore, this point is raised for the first time on appeal. The contention is without merit under such circumstances.
Our conclusion is that the judgment of the trial court was a proper one, under the circumstances of this case, and accordingly it is affirmed. *Page 502